## NICKEL *v.* DASHKO.

### Opinion delivered July 11, 1927.

1. BROKERS—RIGHT TO COMPENSATION.—A broker cannot recover compensation for services voluntarily rendered without any request or employment, express or implied.

2. BROKERS—RATIFICATION OF BROKER'S ACTS.—While a contract of employment may be implied from substantial acts of ratification on the part of the principal, he must say or do something tending to prove that he accepted the broker as his agent in the matter, something more than merely selling to the party whom the broker, while acting as a volunteer, brought to him.

3. BROKERS—CHANCELLOR'S FINDING CONTRARY TO EVIDENCE.—In a broker's suit for commission for assisting in the sale of a mining lease, the chancellor's finding that there was no express or implied agreement to pay a commission *held* contrary to the preponderance of the testimony.

4. ESTOPPEL—SILENCE.—In a suit by a broker to recover a commission for procuring a sale for a mining lease for defendants, the fact that plaintiff was present during a conversation wherein another broker stated to the buyer's attorney that he did not expect a commission, *held* not to estop plaintiff from claiming a commission, since the question was not addressed to him and did not call for a reply by him.

Appeal from Union Chancery Court, Second Division; *George M. LeCroy*, Chancellor; reversed.

*John Bruce Cox* and *J. R. Wilson,* for appellant.

*Powell, Smead & Knox,* for appellee.

KIRBY, J. Appellant brought this suit for a broker's commission for assisting in effecting a sale to the Southern Crude Oil Purchasing Company of a mining lease, owned by John Dashko and others, for $250,000.

It is alleged that Nickel introduced John Dashko, who had authority to represent the other owners, to the officers of the Crude Oil Company, which resulted in its purchase of the property, and for his assistance in making such sale, under his agreement of employment, he was entitled to recover $12,500 for the services rendered.

Defendants denied all the allegations of the complaint, and that they had employed appellant, that he rendered no service whatever, beneficial to them, in bring-

ing about the sale of the property, and that they were indebted to him in any sum whatever.

During the trial, upon a question being asked Dashko the answer to which might have resulted in some disclosures about what had been done with the money realized from this sale and affect materially his defense of other suits, he was permitted to decline answering the question, upon giving a bond to pay any judgment that might be rendered in the case against him.

The chancellor found: ''That the plaintiff is not entitled to recover for commission sued for, but that he performed services for which he is entitled to compensation, and is entitled to the sum of $500 for such services so performed, and the court so finds,'' and entered a decree against John Dashko for $500 and costs, from which this appeal is prosecuted.

Appellant contends that the chancellor's finding that he was not entitled to a broker's commission for making the sale or assisting in bringing it about is contrary to the preponderance of the testimony and contradicted by his finding that he rendered such service in making the sale as entitled him to recover $500 compensation, which finding, he insists, is equivalent to holding that he was entitled to recover a commission, and that, upon such finding made, he is entitled to a decree for the customary commission in making such sales, which the undisputed testimony shows to be 5 per cent., notwithstanding the finding that no commission was earned.

Appellees insist that there was no contract of employment, and that, if an agreement was made to pay a commission, it was without consideration, and that appellant is estopped to claim a commission.

It is settled law that a broker is not entitled to compensation for services unless rendered pursuant to an express or implied request of his employer, and cannot recover compensation for services voluntarily rendered without any employment, express or implied, as said in 4 R. C. L. § 43: ''While a contract of employment may be implied from subsequent acts of ratification on

the part of the principal, the owner must say or do something tending to prove that he accepted the broker as his agent in the matter—something more than merely selling the party whom the broker, while acting as a volunteer, brought to him." See also *Johnson* v. *Garrett, ante,* p. 682. We think that the preponderance of the testimony discloses that Dashko did something more than "merely selling" the parties the broker brought to him, and certainly the decree supported that view.

The evidence shows that Nickel learned, after the gusher was brought in on the Dashko lease, that the Southern Crude Oil Purchasing Company wanted to buy it; that Nickel was engaged in the brokerage business at El Dorado; and he went immediately to the location of the well to find Dashko, and was told by Roy Baker there that Dashko was at Camden, attending court, and Nickel went on there, at the suggestion of Baker, taking Baker with him. He was unable to see Dashko till after court adjourned, and, calling him to the car, he talked with him. Dashko was much excited about the well, and had to go immediately to the lease to arrange for a new storage. Witness told him it was important that he should see him about a matter of interest to him, Dashko, and Dashko agreed to see him as soon as he got to El Dorado. Dashko came into the Garrett Hotel with Roy Baker, where Edgar Black and witness were waiting for him. He walked over to Dashko and told him that he wanted him to come down to the Southern Crude Oil office, as they were in the market to purchase his lease. Dashko replied that "I have a deal on with the Humble, and have an engagement with Mr. Motter at the present time," but that, when he got through with Mr. Motter, he would go down there. "Bender was with me at the time. We waited possibly twenty minutes, and Dashko had not come down, and I suggested to Bender that he go up and see if he was still engaged, which he did, and in a few minutes Dashko and Bender and Motter came down

the elevator, and Dashko said he was ready to go down to the purchasing company's office."

On the way down witness asked Dashko what kind of a proposition the Humble had made, and he replied something under $200,000. Witness told him it probably was worth more than that, and he thought he could get more, and they agreed on a price of $250,000, on the way from the hotel to the Southern Crude Oil Company. They met there Mr. Hardin, Mr. Woodruff, and Mr. Dillahunty, and Nickel introduced Dashko to them. Dashko immediately told them about his lack of storage, and Dashko and witness looked over their maps to see where their 6-inch pipe line ran closest to the lease, and Hardin told Dashko, if he found it necessary, it would not take long to run a line to them. Hardin then asked Dashko if he would sell the property, and what he wanted for it, and Dashko replied that he would take $250,000, and they talked about so much oil and so much cash. Hardin appeared to think the price was rather high. Dashko was firm as to the price, and Hardin said he would like to have until 6 o'clock the following night to get confirmation from Shreveport. Dashko told him that he could not give him that long, that he wanted quick action. Witness (Nickel) saw that Dashko was closing the door for any further negotiations along that line, and called him out into the hall, not knowing that he had a deal on with the Humble at this time, and told him that the proper way to handle the transaction would be to go back and tell Hardin that he had his word out to the Humble people, and it would be necessary for him to go back and see its agent, Mr. Motter, and tell him the trade was off, and to ask Hardin where he could reach him or get in touch with him in the next 15 or 20 minutes, which he did, and Hardin replied that he would be at the Randolph Hotel. Witness told Dashko, out in the hall, that that was as much as he could expect to get out of the property, and much more than the Humble offer, and witness thought it best for him to go back in and explain the situation to Hardin, which he did. The witness, Dashko

and Bender immediately left the offices, and, upon reaching the street, Dashko asked Bender and witness if we thought they were serious about the offer, to which we both told him we felt positive they would carry out the deal if given until 6 o'clock the following night.

Dashko was very much elated over the proposition at the time. "Upon reaching the corner of the Chamber of Commerce the question of commission came up for the first time. I talked to Dashko about paying me a commission if the deal was consummated. He assured me, in Bender's presence, that he would take care of me for my commission, as, if it was not for his friends, he would not be able to do any business. We had now reached the Garrett Hotel, Bender leaving us on the street. Dashko said he would go up and see Mr. Motter, the Humble Company's representative, and tell him the deal was off." Witness told him he would wait for him, and, when he came down, would call Hardin up. When he came down they walked from the Garrett to the Randolph Hotel. They met Roy Baker in front of the Garrett, who went with them. Dashko put in a call for Hardin, and told him that he would wait until 6 o'clock the next night to say yes or no. "Leaving the Randolph Hotel, we then walked to the sandwich shop to get something to eat, and Dashko was then feeling very good, as the deal was practically assured of going through. He told Baker about what had transpired, and repeated practically the same statement he had made earlier in the evening in regard to my commission, and then said that I did not have to worry, that if the deal went through he would take care of me, and I told him that was perfectly all right."

Baker testified that, when Nickel asked Dashko who he should look to for his commission on the sale of the property, Dashko said that he would take care of him about the commission, and that he need not bother about the commission. He told him that he appreciated his friends' help, and always took care of them. He figured he would not be able to do anything without his friends'

help. Nothing definite was said about the amount of the commission. "The deal had not gone through yet, and Nickel wanted to be protected on the commission, and asked Dashko whom he was to look to for the work he had done in the sale."

Dashko stated that he did not agree to pay Nickel a commission, during the transaction, of 5 per cent. or any other amount, saying:

"I never said anything about a commission, and never had any intention to pay a commission to any one, but I did say to Bender and Nickel that I appreciated their friendly assistance in helping close the deal and for introducing me to the Southern officials, and for that I would never forget, meaning that I would reciprocate some of these days the same." * * *

"Later, when we came out of the office we ran into Baker, and, as we were walking across the street, Mr. Nickel mentioned something about what he was going to get out of it. He didn't ask if he was working for a commission, or intended to get a commission. He said, 'For myself, I wonder what I am going to get,' and my answer to him was 'For the assistance you gave me I never will forget that.' That was the words I used. It was never the intention in my mind to give him a commission."

Nickel's statement showing the service rendered and Dashko's agreement to take care of his commission, if the sale was made for $250,000, is corroborated by three other witnesses, and Dashko himself admits that, during the negotiations, Nickel asked him what he was going to get out of it, and he replied that, for the assistance given him, he would never forget it, but that he did not intend to give him a commission when this remark was made.

The chancellor's finding that there was no agreement to pay a commission or from which such an agreement could be implied is clearly against the preponderance of the testimony, in our opinion. Neither do we think there was any showing of a condition that estopped Nickel from

claiming the commission earned. Before the contract was finally made, Dashko told the president and attorney of the Southern Crude Oil Purchasing Company that he would not take the $250,000 if he had to pay a commission. The attorney then sent for Bender, whom he had asked in the first instance to get in touch with Dashko, to see about the purchase of the property. Nickel came up with Bender, whereupon he told Bender that Dashko would not pay a commission, and asked him, Bender, if he expected a commission, to which Bender replied that he did not. The attorney did this because he did not know whether Bender might not expect a commission and might want the company to pay it, if it was not received from Dashko. While it is true that Nickel was present when the conversation occurred, but the questions were not addressed to him, nor was there any reason to think that he was expected to reply, since he had no agreement or understanding whatever with the purchasers about a commission, and, having been assured by Dashko that he would be taken care of on his commission, if the sale was made for $250,000, the circumstances did not require him to speak or disclose whether he expected to receive a commission or not, and Dashko, having promised to pay him a commission, could not escape the obligation to do so after the service was rendered, by such a proceeding. If he intended to do so it was incumbent upon him, having had the conversation or agreement with Nickel about the commission, to say then to Nickel that he would not pay any such commission, if he had changed his mind about it.

The undisputed testimony shows that 5 per cent. of the contract or sale price was the usual commission paid for such services, and the preponderance of the testimony shows an agreement on the part of Dashko to pay, or circumstances from which an agreement for the payment of a commission would necessarily be implied.

The chancellor erred in holding otherwise, and the decree must be reversed, and the cause remanded with directions to enter a decree in favor of Nickel for a com-

mission of 5 per cent. of the sale price, $12,500, and also against the sureties on the bond given for the performance of the judgment for the amount thereof, and for such further necessary proceedings in accordance with the principles of equity and not inconsistent with this opinion. It is so ordered.